300 P.2d 610

PACIFIC STATES CAST IRON PIPE CO. et al., Plaintiff,

and

Alvin T. Locke, Intervening Plaintiff and Respondent,

v.

HARSH UTAH CORPORATION, a corporation, Harsh Investment Corporation, a corporation, and Harold J. Schnitzer, an individual, Defendants and Appellants.

No. 8336.

Supreme Court of Utah.

Aug. 10, 1956.

Rawlings, Wallace, Roberts & Black, Dwight L. King, Salt Lake City, for appellants.

Young, Thatcher & Glasmann, Ogden, John M. Sherman, Pasadena, Cal., for respondent.

WORTHEN, Justice.

Appeal from a judgment awarding a bonus to intervening plaintiff, Alvin T. Locke, under a contract entered into between Locke and defendants Harold J. Schnitzer and Harsh Investment Corporation. This action arose in connection with the construction of the Hill Field Garden Home Project, which construction was undertaken by the defendants under the provisions of the Federal Wherry Housing Act 5 U.S.C.A. §§ 626s, 626s–1, 626s–2, 10 U.S.

246

C.A. §§ 1269, 1269a, 1269b, 34 U.S.C.A. §§ 553, 553b, 553c. Locke was the employee of defendants and the construction superintendent in charge of the building of the said project.

The original suit was brought against the named defendants by certain subcontractors and materialmen who had claims in connection with the project but prior to and subsequent to the trial court's decision concerning their claims, all were settled and the only question left for our decision is the extent to which Locke is entitled to a bonus against the defendants or any of them, if at all.

In order to understand the contract from which this action arose, it may be well to refer briefly to the parties and their background. Harold J. Schnitzer was and is a Portland, Oregon investor, and the sole owner of each of the following corporations, except for the necessary qualifying shares: Harsh Investment Corporation, Harsh Utah Corporation, Harsh Construction Co., Schnitzer Construction Co., Harsh Montana Corporation, Harsh California Corporation and Pacific Coast Equipment Company.

Alvin T. Locke had no capital to invest but was experienced in the construction field, having been construction superintendent on other type construction projects, but his only prior experience with Wherry Housing projects was on the Dugway project built by Cantell Construction Company for whom Locke worked.

The Hill Field project was built by the Schnitzer interests under the Wherry Housing Act. Under this act, the government determines that a need exists for military housing in a particular area. Then it submits an invitation to bid which specifies the maximum insurable mortgage which will be accepted by the government and the FHA estimated total replacement cost, the former figure being 90% of the latter figure. The maximum insurable amount will be reduced to 90% of the amount the sponsor estimates as replacement cost, which is indicated on his bid. The sponsor is required to deposit additional capital considered sufficient to insure completion of the project.

The government accepts the low bid figure by the various free competitive bidders, and upon the assurance of the sponsor that he will build the project, leases to him for a nominal rent of $100 per year the land involved for a period of 75 years. The mortgagor then builds the project upon the land, borrowing from the United States up to 90% of the total replacement figure. This loan is then repaid to the government from the operational profit, if any, on the project, and is to be retired in 33⅓ years, during which time full depreciation is allowed on the project.

The basic dispute between the parties arises from the question of whether or not

the profits on the project from which Locke's bonus is to be computed are to be computed on the mortgage receipts less expenses or on some other standard.

The parties entered into several contracts before they reached the consummation of their negotiations on October 4, 1951. In June of 1951, Locke contacted Schnitzer and informed him of the availability and desirability of bidding on these Wherry Housing Projects. Prior to this time Schnitzer had no experience at all with Wherry Housing and very little with construction work. Pursuant to the sales work of Locke and his experience as a construction worker Locke and the Schnitzer interests entered into a series of contracts between June and October of 1951.

The first of these, executed on June 21, 1951, pertained to the Deseret Chemical Depot and provided a $50,000 fee from Schnitzer to Locke in consideration of Locke's preparing bid documents and quotations on the project. The $50,000 was payable from profits of the owner-manager in connection with the construction of the project.

The second agreement between Locke and Schnitzer was executed on July 24, 1951. It was a modification of their earlier agreement and provided for a joint ventureship agreement between Locke and Schnitzer which would guarantee to Schnitzer the sum of $150,000 profit and provided that all profits above $150,000 should be divided equally between Locke and Schnitzer.

The attempt to secure the construction contract on the Deseret Chemical Depot was unsuccessful and neither of the two agreements resulted in any profits.

The parties then turned their attention to other projects, including the Hill Field Garden Homes Project. An agreement executed August 29, 1951, between Locke and Schnitzer provided that,

"And, Whereas, Mr. Harold Schnitzer is to provide certain capital for the construction of such Wherry Housing Projects including the Davis-Monthan Housing Project, the Hill Field Housing Project and the Great Falls Air Base Housing Project,

"And Whereas Mr. Alvin Locke is to provide supervision for the construction and completion of these projects in the event of an award for the construction to the undersigned or their companies.

"Now Therefore, it is agreed, by Harold Schnitzer and Alvin Locke that they shall, in the event that they are successful bidders for such construction as herein discussed, form a company for the purpose of constructing and completing the subject construction program. Any company which shall be so formed by Harold Schnitzer and Alvin Locke for the purpose of constructing Wherry Housing Projects shall guarantee to Harold Schnitzer

from the profits of the venture, *a minimum sum equal to 10% of the total monies received from the Government for such construction.* In addition to the aforementioned guaranteed profit to Mr. Harold Schnitzer an additional sum shall be paid to Mr. Harold Schnitzer by the joint venture company equal to *one-half of all profits earned* by the aforementioned *above 10% guaranteed amount to Harold Schnitzer*; the balance of one-half of all profits earned in excess to the aforementioned guaranteed profit to Mr. Schnitzer, shall be paid to Mr. Alvin Locke by the joint venture." (Emphasis added.)

The final refinement of the agreement between the parties was executed on October 4, 1951, in Portland, Oregon. The record reveals that although Schnitzer was the moving party in changing the agreement, the final draft which was executed was revised and prepared by Locke's attorney. It is the construction of this agreement which is the bone of contention between the parties.

The October 4, 1951, agreement added another party, Harsh Investment Corporation, which was referred to throughout the agreement as Harsh. This agreement gave Locke a salary of $1,000 per month in addition to 50% of all profits from construction after Schnitzer had withdrawn 10% of bids from profits earned by Harsh in connection with the construction of the project.

The October 4 agreement is not very lengthy and it is herewith set out in full:

"This Agreement, Made and entered into this 4th day of October, 1951, by and between Harsh Investment Corp., an Oregon corporation, hereinafter referred to as 'Harsh,' Harold J. Schnitzer, hereinafter referred to as 'Schnitzer,' and Alvin T. Locke, hereinafter referred to as 'Locke,'"

### Witnesseth

"Whereas Schnitzer and Locke have heretofore entered into different agreements with respect to the bidding and construction of certain Wherry Housing Projects in the States of Arizona, Utah and Montana, and

"Whereas, *Harsh, a corporation in which Schnitzer has an interest, heretofore, as sponsor corporation, bid on* the Davis-Monthan Housing Project at Tucson, Arizona, *the Hill Field Housing Project at Ogden, Utah,* and the Great Falls Air Force Base Housing Project at Great Falls, Montana, and

"Whereas, The parties hereto are desirous of cancelling all agreements between them heretofore made, and su-

perseding said agreements with the agreement between the parties hereto as hereinafter more particularly set forth,

"Now, Therefore, it is agreed by and between the parties hereto as follows:

"The recitals hereinabove set forth are true and correct.

"All agreements between the parties hereto which have heretofore been made with respect to any of the matters herein referred to are hereby cancelled and superseded in the matter as hereinafter more particularly set forth.

"In the event that *Harsh is award-ed* by the United States Government *the contract for the construction and management of the projects* hereinabove mentioned or any of them, *Harsh may employ Schnitzer*, and/or any other person or corporation, as Harsh may elect, *to perform the actual construction of the said* projects or any of them, and Harsh shall employ Locke as general construction superintendent therefor.

"In the event that *Harsh shall employ Schnitzer to construct the afore-said projects* or any of them, *then Harsh shall pay to Locke for his services as construction superintendent,* as aforesaid *the sum of One Thousand and no/100 Dollars* ($1,000.00) per month,

retroactive to October 1, 1951, for a term of one year thereafter and for such term thereafter as Harsh may require the services of Locke in connection with the completion of the construction of said projects or any of them. Locke agrees that throughout said period of time, he will in the best interests of Harsh devote his full time and attention exclusively to the services of Harsh as aforesaid, and in connection therewith shall perform such services as may be directed by Harsh. *In addition to the salary aforesaid, Locke shall,* under the circumstances aforesaid, and at the time hereinafter set forth, *receive a bonus computed in the following manner:*

"*From the net profit earned by Harsh in connection with the construction* of the aforesaid projects, *there shall first be retained by Harsh* a sum of money equal to *ten percent (10%) of the total amount of the bids made by Harsh and accepted by the Government* on the aforesaid projects, and *from the remaining net profits earned by Harsh* as aforesaid *there shall be paid to Locke fifty percent (50%) thereof by way of bonus,* as aforesaid. For the sake of clarity, it is understood that in the event the construction work is handled in any other manner than contracting the entire job on any or all of

said projects as hereinafter set forth, then the foregoing provisions shall be applicable.

"In the event that Harsh should elect not to engage the services of Schnitzer to perform the construction work of the aforesaid projects or any of them, and *if Harsh should elect to enter into any agreement with any other firm, person or corporation to perform the entire construction work* on any or all of said projects *on the basis of a guaranteed profit to Harsh,* then, in lieu of salary and bonus to be paid to Locke, as hereinbefore set forth, Harsh shall pay to Locke the aforesaid salary of $1,000.00 per month for a term of one year retroactive to October 1, 1951, and for such additional term as Locke's services may be required by Harsh and all reasonable travel or other expense, together with ten percent (10%) of the *guaranteed profit received by Harsh* for each of said projects which are contracted to a third party on the basis of a *guaranteed profit to Harsh* as in this paragraph more particularly set forth, with a minimum of Fifteen Thousand and no/100 Dollars ($15,000.00) per project, limited, however, to the maximum sum of Twenty-Five Thousand and no/100 Dollars ($25,000.00) for each of said projects, except that the additional *profits* if any as hereinafter

provided relating to F.H.A. adjustments shall be payable in addition to said $25,000.00 limit. Locke shall under the circumstances in this paragraph set forth, supervise the construction of the aforesaid projects, in the interest of Harsh, to ascertain that said projects are performed in accordance with plans and specifications agreed to by Harsh, and Locke shall devote his full time and attention in connection therewith.

"In addition to the sums otherwise provided in the preceding paragraph, Locke shall receive a sum equal to ten per cent (10%) of all *net profits received by Harsh* as F.H.A. adjustments, *the same being additional compensation to Harsh* for changes in plans and specifications, or increased labor costs, *from the United States Government for the construction of said projects,* or any of them, *over and above the profits involved in the original bids of Harsh accepted by the Government.*

"*All sums* due to Locke from Harsh under the terms of this agreement, other than monthly salary payments and reimbursement of expenses approved by Harsh *shall be paid* to Locke after all services to be performed by him, as herein elsewhere set forth, have been performed, and *immediately upon completion of the construction of the*

*projects* awarded to Harsh *and receipt by Harsh of profits earned.*

"It is understood and agreed between the parties hereto that Locke has and shall have no interest in and to the ownership or the management of the projects hereinbefore mentioned or any of them, or in connection with any profits that may be derived therefrom, it being the intention of the parties that the interest of Locke shall be limited to the construction of said projects or any of them as in the manner hereinbefore set forth.

"In Witness Whereof the parties have hereunto set their hands and seals the day and year first above written.

"/s/ Harold Schnitzer

Harsh Investment Corp.

"by Harold Schnitzer, Pres.

"/s/ Alvin T. Locke"

(Emphasis added.)

At the time this contract was executed and thereafter until the spring of 1952, it was contemplated by the parties that Harsh Investment Corporation would be the sponsor and the parties were negotiating with various companies to be construction companies on the job. On November 14, 1951, the certificate of need issued by the Air Force designated Harsh Investment as sponsor and the builder as Herbert Vitt.

Negotiations with various construction companies failed to result in an agreement

on the basis of a guaranteed profit to Harsh Investment, (none being willing to make such guarantee) and Harold Schnitzer caused Harsh Utah Corporation to be formed to take over the owner-manager duties and Harsh Investment Corporation which had been previously designated as sponsor, was designated the construction company.

Subsequently, a contract was entered into between Harsh Utah Corporation and Harsh Investment Corporation whereby Harsh Investment Corporation agreed to construct the project for the basic total sum of $2,995,000. It is the contention of respondent with which the trial court agreed that Locke was to be paid a bonus as a result of the profit to the construction corporation, Harsh Investment Corporation, under this contract with Harsh Utah Corporation.

The basic disagreement between the parties goes to the measurement of profit under the October 4 agreement, and to the computation of income and expenditures in determining that profit. Plaintiff contends that income should consist of all money due under the construction contract and its change orders between the two Harsh companies plus net rental income during the construction period. Plaintiff contends that the amount of the construction contract and its change orders was to be paid from both mortgage proceeds *and* over $600,000 in

capital which Schnitzer was required to deposit with the lender at the beginning of the project, and that this said capital contribution was later withdrawn by Schnitzer illegally. Defendants contend that income should consist of mortgage proceeds plus the amounts that these were increased by approved change orders, and that the intent of the parties was that Schnitzer was to recover his capital investment before any profits from construction were to be computed.

Plaintiff contends that proper expenses are only those properly chargeable to a construction company in the building of the project less all intercompany profits, whereas defendants contend that all costs of the project during the construction period including those properly chargeable to the owner-manager corporation were to be taken into consideration in determining the profit earned from construction.

The trial court sitting without a jury adopted plaintiff's contention that income of the project was the amount Harsh Investment was to receive under its construction contract with Harsh Utah. The trial court then rejected plaintiff's contention as to change orders and allowed further income only to the extent that the change orders resulted in an increase in the mortgage amount rather than the amount of the contracts for change orders between Harsh Investment and Harsh Utah. The trial court then adopted plaintiff's position as to expenses and differentiated between project and construction expenses allowing only construction expenses as expenses to Harsh Investment Corporation.

Plaintiff also contended that the 10% allowance out of profits due Schnitzer at the completion of the project should be disallowed on the ground that he failed to finance the project properly resulting in a failure of consideration for the 10% allowance and that therefore it should fail. The trial court found that defendant Schnitzer did not properly finance the project, but found that this failure did not harm Locke except in the payment of claims which had already been taken into account in computing the expenses and that therefore defendant was still entitled to a 10% allowance.

The trial court disallowed any inter-company profit made by another Schnitzer corporation, Pacific Coast Equipment Company, in its dealings with Harsh Investment Corporation, holding that this was an intercompany profit that could not logically be denominated an expense of construction in connection with the project. The trial court also disallowed any salary to Schnitzer.

Judgment was awarded to plaintiff Locke in the sum of $165,161.73 less certain amounts owed by Locke to defendants, leaving a net to Locke of $148,272.26. The judgment was further altered to include an-

other expense item at a later date making the net amount of the judgment $147,905.

The award of the judgment of a bonus to Locke was computed as follows:

Income:
a) Construction Contract Lump Sum ... $2,995,205.00
b) Change Order Extras ... 178,672.00
c) Rental Income Net ... 165,986.49

$3,339,863.49

Expenses
a) Direct Construction Expenses ... $2,656,457.21
b) Indirect Expenses—General Overhead ... 45,631.34
c) Am't of Judgments in this action addition to expenses already in (a) ... 69,597.31

2,771,685.86

Net Profit from Construction ... 568,177.63
Less 10% of Bids ... 276,700.00

Amount to be Divided between Locke & Schnitzer ... 291,477.63

One-half of amount equals $145,738.81 with interest thereon.

The basic questions in the case are: (1) Did the trial court err in awarding plaintiff profits figured on income from the construction contract—lump sum? (2) Did the trial court err in awarding plaintiff profits figured on only part of the project expenses, the applicable part awarded to construction expense as distinguished from project expense? (3) Did the trial court err in awarding plaintiff profits figured on income from rentals during the construction period?

If the first question is answered in the affirmative, it is not disputed by any of the parties that Locke will not then be entitled to a bonus.

Using plaintiff's counsel's own words, plaintiff Locke seeks "to recover a bonus due under a contract between the parties for the bidding and construction of said Wherry Housing Project." The question of interpretation of this contract is then primarily a question of law for the court and an integrated contract cannot be varied, modified or contradicted by parol evidence.[1]

It would seem clear that a complete reading of the October 4, 1951, agreement set out in full herein necessarily carries with it an affirmative answer to the first question

1. Smith v. Burton, 4 Utah 2d 61, 286 P.2d 806.

when the parts of the agreement italicized in the opinion are considered.

It cannot be denied that all parties involved in this appeal were seeking to put their hands deeply in Uncle Sam's pocket and come up with a handsome profit, and we are concerned here only with a falling out among those deep reachers.

The record shows that Locke was the moving party in inducing these bids upon government contracts, and that he was the only party with construction experience prior to 1951 upon these and other projects and probably the party with influence. The record also shows that Locke and Schnitzer entered into several agreements which culminated in the October 4 agreement.

We are unimpressed with the contention of respondent that, although the monies received from the government were to be used in computing profit under the August 29 contract that in the October 4 contract the profit was to be computed on an unascertained and highly arbitrary amount of a contract between two corporations wholly owned and operated by Harold Schnitzer, when, if he had been so inclined, he could have set the amount of the building contract at any figure he chose—one much less than the one used. Counsel for respondent declares that Locke had given up a valuable ½ ownership interest in the project by the October 4 agreement which he possessed under the August 29 agreement for only a ½ interest in the profits from construction, and that therefore his bonus should be computed in the manner claimed. It must be remembered, however, that Locke was given under the October 4 agreement not only ½ of the profits earned from construction, but also was given a guaranteed salary of $1,000 per month from Schnitzer.

The $1,000 per month guaranteed salary was certainly adequate consideration for the surrender of a ½ interest in remote, speculative, and highly uncertain profits from rentals of the project when completed.

A reading of the October 4 agreement shows that the only profit contemplated in the agreement from which Locke was to be paid a bonus was the profit to be earned from monies obtained from the government less construction building expenses. It would be difficult to comprehend any other interpretation of the second half of the contract which provided for Locke's bonus computation in the event negotiations resulted in awarding the construction to a third party on the basis "of a guaranteed profit to Harsh." This "guaranteed profit to Harsh" could only have resulted from a construction of the project at less than the government mortgage proceeds, treating the mortgage proceeds as income and the construction contract as expense.

Therefore we arrive at the proper formula for computing Locke's bonus by

computing receipts from mortgage proceeds as income and the construction expenses the amount of which are not in dispute as expenses. Assuming then for the purpose of computation that the trial court was correct in its finding as to the inclusion of rental income it becomes clear that under the terms of the contract, there was no construction profit earned by Harsh and consequently no profits to support a bonus to Locke under the undisputed income and expense figures as follows:

Income
a) Mortgage Receipts   $2,636,800.00
b) Change Orders   178,672.00
c) Rental Income   165,986.49

    Total Income      $2,981,458.49

Expenses
a) Direct Construction Expense   $2,656,457.21
b) Indirect Construction Expense   45,631.34
c) Judgments entered in action   69,597.31

    Total Expenses      2,771,685.86

Net Profit from Construction      209,872.14
Less 10% of bids to Schnitzer for financing      276,700.00

             Nothing

A construction of the contract according to the terms contended for by respondent is manifestly contradictory to its plain terms when the contract is considered in the light of the surrounding circumstances and the situation of the parties at the time it was entered into.

Alvin T. Locke was the moving party in getting Schnitzer to act upon bidding in Wherry Housing Projects, and according to Locke's own testimony was the only person familiar with Wherry Housing and F.H.A. regulations when the contracts between the parties were made.

Locke had nothing to contribute for which he would be entitled to compensation, except his brain and know-how. Schnitzer had to provide all necessary capital for the financing in order to secure the bids for the project. The evidence is undisputed that even Locke had little knowledge or experience with these particular types of projects and very little formal education, although he had much construction experience.

It is inconceivable that Schnitzer contemplated any scheme whereby he would be forced to pay to Locke from his own funds, a bonus calculated on only a paper intercompany profit of his own corporations.

It is evident to us that any profit to be figured on the Hill Field project under this contract of October 4, 1951, must be figured

upon a profit calculated to the owner-sponsor-manager corporation and not to the construction corporation as it was figured by the trial court. It was conceded by plaintiff's accountant that neither Schnitzer nor the owner-manager corporation made any profit from the construction of the project. It seems to us that the plain, unambiguous terms of the contract italicized herein require a profit to the owner-manager corporation from the construction before Locke is entitled to a bonus.

Locke received during the construction period of this project a salary of $1,000 per month. It would be inconceivable that Schnitzer would also agree to pay Locke a bonus out of Schnitzer's own capital rather than out of profits earned, and it is evident from the contract itself that the bonus flowing from Schnitzer to Locke was only to come out of profits received by Harsh as sponsor during the construction period from sources other than Harold J. Schnitzer himself who was the only party concerned with the profits or lack thereof of Harsh Utah Corporation or Harsh Investment Corporation. Nothing in the agreement would indicate that Schnitzer would take capital from one corporation entirely owned by himself and deposit it to income of another corporation entirely owned by himself in order to provide a profit from which Locke might be paid a bonus.

The italicized portions of the October 4 agreement hereinbefore set out allow no different interpretation, especially in view of the fact that the final draft of the agreement was prepared by Locke's attorney, and that Locke was the only party to the agreement with any previous experience in Wherry Housing.

It appears too clear that both Schnitzer and Locke did not plan on losing any money. It is clear that they intended to build the project with the money furnished under the F.H.A. mortgage on the project. They envisioned substantial profits to be realized by building the project with much less than the 90% of the replacement cost of the project. They expected to get theirs from the money that the government furnished the sponsor. The Federal Housing Administration required the sponsor to either make escrow deposits of the approximate difference between the replacement cost and the amount that would be furnished under the mortgage or to furnish other satisfactory assurance of the sponsor's ability to complete the project. The escrow deposit made by Schnitzer with the lender was for protection to the government, and was in the nature of a guarantee that the project would be completed. It was not deposited for Locke's benefit or protection. The record discloses that the project is completed and the escrowed funds have been returned to Schnitzer. Locke has no interest in such funds, nor can they be considered as a profit in the construction of the project. The Federal Housing Administration might well

have demanded a deposit twice as large, but under no circumstance did Locke have any interest in the escrow deposit. There is no provision in the contract which will justify Locke's contention, and it is inconceivable that Schnitzer would deposit his own funds just to afford Locke an opportunity to help him divide them.

■ Nor can we agree with the trial court that Locke was entitled to share in any rentals. The last paragraph of the October 4 agreement declares that Locke shall have no interest in any profits that may be derived from the ownership or management of the projects mentioned.

In further support of our holding, it may be observed that before the project was built, and the parties had only foresight, profits from the project construction were figured on the basis of mortgage loans from the government less expenses and not on the basis of any inter-company profit between two Schnitzer-owned corporations.

We are of the opinion that any profit to be shown must be on the basis of a profit to Schnitzer who was the real party in interest, and respondent's accountant admits that on the basis of a consolidated balance sheet to Schnitzer there was no profit earned by the construction of the project.

We have a great deal of sympathy for the trial court which was required to wade through a morass of claimed embezzlement and perjury, accusations and counter-accu-sations as well as recriminations between opposing counsel, but we cannot allow even the self-confessed perjury of the appellant Schnitzer to blind our eyes to the plain, unambiguous terms of the contract between the parties.

The judgment of the lower court awarding a bonus to Locke on the Hill Field project is reversed and stricken from the judgment of the lower court and as so modified the judgment is affirmed. Costs to appellant.

CROCKETT and WADE, JJ., concur.

HENRIOD, J., concurs in the result.

McDONOUGH, C. J., dissents.